**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| A.K., A Minor, By Her Mother and Next Friend, | : | |
| Joyce Banin, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civil Action No. 1:14cv26** |
| | : | **(LO/TRJ)** |
| BRIAN BYERSON, et al. | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT**
**BRIAN BYERSON'S MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO FED. R. CIV. P. 56(b)**

Defendant, Brian Byerson (Byerson), by counsel, has moved the Court for summary

judgment pursuant to Fed. R. Civ. P. 56(b).  In support of his motion, Byerson states as follows:

**BACKGROUND**

On January 9, 2014, the Plaintiff, A.K., filed her initial Complaint against Byerson, a

Fairfax County police officer, alleging that Byerson had violated her Fourth Amendment right to

be free from an unreasonable seizure.  The case proceeds now on A.K.'s Second Amended

Complaint (Complaint), filed on August 19, 2014.  The allegations in the Complaint relate to

Byerson's visit to A.K.'s home on January 20, 2012.

**LIST OF MATERIAL FACTS NOT GENUINELY IN DISPUTE**

1.       On January 20, 2012, officers from the Fairfax County Police Department,

including Byerson, went to the apartment of A.K., the minor child of Joyce Banin (Banin). (S.J. Ex. 1,¶ 4.)[1]

2.      The officers went to Banin's apartment in conjunction with an investigation into criminal wrongdoing committed by Christopher Alipui (Alipui), who Byerson had arrested in the days prior.  (S.J. Ex. 2, Byerson Dep. 34-38.)[2]

3.      Alipui was suspected of, among other illegal activities, purchasing electronics using lines of credit obtained with stolen identities, and shipping those electronics overseas. (S.J. Ex. 3, Thornton Dep. 19-20.)[3]

4.      Byerson developed Banin's name as a potential witness in the Alipui investigation, and went to her apartment to determine whether Alipui lived with her, or whether there was evidence related to Alipui's criminal activity within Banin's apartment.  (S.J. Ex. 2, Byerson Dep. 37-38, 41-42.)

5.      Banin was connected to Alipui during the investigation because Alipui listed Banin as his emergency contact when he was booked into jail after Byerson arrested him, and because one of Aliupi's known alias names was associated with Banin's address in a police database.  (S.J. Ex. 3, Thornton Dep. 20-21.)

6.      Banin was at home with A.K. and a family friend, Grace Nimoh (Nimoh), when the officers arrived.  (S.J. Ex. 4, A.K. Dep., 31.)[4]

---

[1] Exhibit 1 is the Second Amended Complaint filed by the Plaintiff.  References to the Second Amended Complaint are cited as "¶" followed by the applicable paragraph number.

[2] References to deposition testimony are cited by the deponent's name, followed by "Dep." and the page number.  Exhibit 2 is Byerson's deposition transcript.

[3] Exhibit 3 is Officer Jesse Thornton's deposition transcript.

[4] Exhibit 4 is A.K.'s deposition transcript.  A.K. refers to Nimoh as her grandmother, although the two are not related.

7.      Banin answered the door when the officers arrived and consented to the officers

entering her apartment.  (S.J. Ex. 1, ¶ 6.)

8.      A.K. was in the living room of the apartment when the officers entered.  A.K.

alleges that she heard Banin ask the officers where their search warrant was, and one officer

responded that they did not need a search warrant.  A.K. then left the room and went to her

bedroom.[5]  (S.J. Ex. 4, A.K. Dep. 36-37, 39, 41-42.)

9.      Officer Jesse Thornton (Thornton) had with him a personal pen camera that he

turned on inside the apartment.  Once activated, the camera captured the interaction between the

officers and Banin in the living room area of the apartment.  (S.J. Ex. 5, S.J. Ex. 6.)[6]

10.     Byerson and Thornton spoke to Banin regarding whether Alipui lived with her,

whether Alipui kept any of his belongings in the apartment, and whether Alipui had asked Banin

to remove his belongings from the apartment.  Byerson's and Thornton's questions were geared

toward seeking information about Alipui's activities.  (S.J. Ex. 5; S.J. Ex. 6.)

11.     During her conversation with the officers, Banin sat on the couch in the living

room of the apartment.  From her vantage point, she could see down the hallway within the

apartment that led to A.K.'s bedroom.  (S.J. Ex. 4, A.K. Dep., 65.)

12.     Banin told the officers that they could search her apartment on three separate

occasions.  On the final such occasion, she granted them consent to search independently of a

---

[5] Byerson denies that there was a conversation between the officers and Banin regarding whether
they needed a search warrant, however, he understands that for purposes of summary judgment
the Court must treat that allegation as if it is true.
[6] Exhibit 5 is a digital copy of the video of the encounter in Banin's apartment.  Exhibit 6 is a
transcript of the video recording.  References to specific passages of the transcript are indicated
by "p." followed by the page number(s) where appropriate.

request for consent by the officers.  (S.J. Ex. 5; S.J. Ex. 6, p. 3, 19, 28.)

13.     Byerson walked down the hallway and saw A.K. in her bedroom playing on a computer tablet.  A.K. had not turned the light on in her bedroom because she didn't need it to see; sufficient light emanated from the tablet and the hall.  (S.J. Ex. 1, ¶ 12; S.J. Ex. 4, A.K. Dep., 42-43.)[7]

14.     Byerson asked A.K. where she had gotten the tablet, and A.K. responded that Alipui had given it to her.  (S.J. Ex. 4, A.K. Dep., 48.)[8]

15.     Byerson asked several follow up questions about Alipui, including whether he often gave A.K. and her mother gifts like the tablet that she was using, whether he lived in the apartment, whether he brought or left a work bag to the apartment when he visited, and whether A.K. had recently been to Alipui's house.  (S.J. Ex. 4, A.K. Dep., 47-48.)

16.     When he spoke to A.K., Byerson was serious, had a deep voice, and had his hand on his uniform belt.  These were the only things that A.K. noted about Byerson's appearance or demeanor while they spoke.  (S.J. Ex. 4, A.K. Dep., 73-74.)

17.     A.K. alleges that Byerson returned to her room a second time, accompanied by one other officer who did not speak, and asked her the exact questions that he had asked previously.  (S.J. Ex. 4, A.K. Dep., 46, 74-77.)

18.     A.K. alleges that Byerson's demeanor was the same the second time he spoke to her:  his voice was serious and deep, and he had his hand on his belt.  (S.J. Ex. 4, A.K. Dep.,

---

[7] During her deposition, A.K. did not know the names of the officers who entered her apartment.  She referred to Byerson as "the black officer" because Byerson was the only African-American officer who entered the apartment.  (S.J. Ex. 4, A.K. Dep. 40.)

[8] A.K. also referred to Aliupi as "dad" and "Chubby" during the course of her interaction with Byerson, and also during her deposition.  (S.J. Ex. 4, A.K. Dep. 48.)

77-78.)

19.     A.K. was cooperative and answered all of Byerson's questions.  A.K. did not tell Byerson that she did not want to speak with him at any point during their interaction.  (S.J. Ex. 4, A.K. Dep., 72-73, 77.)

20.     After Byerson returned to the living room, a discrepancy arose with Banin regarding information that A.K. had provided to Byerson, which conflicted with information that Banin had provided.  Specifically, discrepancies existed related to whether Alipui had been to Banin's home within the last several days, whether Alipui left his work bag at Alipui's home, and whether Banin and A.K. had been to Alipui's house the day before.  (S.J. Ex. 5; S.J. Ex. 6, p. 16-17, 21-23.)

21.     Banin called A.K. into the living room and questioned her about where A.K. and Banin had gone the day before.  A.K. answered those questions in front of Byerson and Thornton.  (S.J. Ex. 5 S.J. Ex. 6, p. 21-23.)

22.     A.K. remained in the living room after being questioned by Banin, and the officers continued speaking with Banin.  (S.J. Ex. 4, A.K. Dep., 49-50.)

23.     A.K. did not pay attention to any of the remaining conversation between Banin and the officers after she returned to the living room.  (S.J. Ex. 4, A.K. Dep., 50.)

24.     The officers left Banin's apartment without developing any additional evidence against Alipui.  (S.J. Ex. 1, ¶ 20-21.)

## I.  LEGAL STANDARD

Summary judgment under Fed. R. Civ. P. 56 is appropriate when there are no material facts genuinely in dispute and the moving party is entitled to judgment as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  There is no issue for trial unless there exists

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  The court must construe the facts in the light

most favorable to the nonmoving party, and may not make credibility determinations or weigh

the evidence.  *Id*. at 255; *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006); *Edell & Assocs.,*

*P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435 (4th Cir. 2001).  A court should enter

summary judgment "against a party who fails to make [an evidentiary] showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The existence of a scintilla of

evidence in support of the nonmoving party's position fails to defeat summary judgment.

*Anderson,* 477 U.S. at 252.

## II.      THE PLAINTIFF CANNOT ESTABLISH LIABILITY UNDER SECTION 1983.

"A federal civil rights claim based upon § 1983 has two essential elements: '[A] plaintiff

must allege the violation of a right secured by the Constitution and laws of the United States, and

must show that the alleged deprivation was committed by a person acting under color of state

law.'"  *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins*,

487 U.S. 42, 48 (1988)).  In this case, A.K. claims pursuant to 42 U.S.C. §1983 that Byerson

seized her in violation of the Fourth Amendment's prohibition against unreasonable searches and

seizures.  U.S. Const. Amend. IV.

### A.      The Plaintiff was not seized within the meaning of the Fourth Amendment.

The Fourth Amendment provides that citizens have a right "to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  *Terry v. Ohio*, 392 U.S.

1, 8 (1968). The Fourth Amendment is not implicated by the interrogation or questioning of citizens by law enforcement officers, unless it results in a seizure of the person. *Id.* The only issue presented in the instant case, therefore, is whether Byerson unreasonably seized A.K. by approaching her in her own home, which he had entered with Banin's consent, and speaking with her for a brief period of time.

The Fourth Amendment's proscription against unreasonable search and seizure is not triggered when a law enforcement officer approaches an individual and asks questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Id.*, *quoting California v. Hodari D.*, 499 U.S. 621, 628 (1991). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority' terminates or restrains his freedom of movement." *Bostick*, 501 U.S. at 434, *quoting Terry v. OH*, 392 U.S. 1, 19 n. 16 (1968). No facts were developed in discovery to show that Byerson physically used force to restrain A.K. Thus, the more narrow issue in this case is whether Byerson's actions constituted a "show of authority" sufficient to result in a seizure of A.K.

Whether a seizure has occurred through an officer's show of authority is dependent upon consideration of all of the facts and circumstances surrounding the contact. *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988); *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980). The standard to be applied is an objective standard, not taking into account the state of mind of the individual who is approached. *Chesternut*, 486 U.S. at 574. In instances where a citizen is

7

approached by a law enforcement officer in an area where the individual is confined, or

otherwise not free to walk away from the officer, the inquiry is not whether the individual was

"free to leave" when approached by the officer, but whether the action of the officer "convey[s] a

message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 435

(1991) (finding no seizure when officers approached a bus passenger and obtained consent to

search his luggage despite the allegation that officers had "towered over" the passenger within

the confines of the bus and that the passenger could not walk away from the officers because the

bus was ready to depart).

Similarly, in the case of *I.N.S. v. Delgato*, 466 U.S. 210 (1984), the Supreme Court found

that workers in a factory who were approached and questioned by law enforcement officers

regarding their legal right to be in the United States were not seized for Fourth Amendment

purposes even though officers were stationed at the exits to the factory. *Id.* at 218-19.  Finding

that the workers' freedom of movement had not been curtailed enough to trigger the Fourth

Amendment, the Court stated that "[t]he manner in which respondents were questioned, given its

obvious purpose, could hardly result in a reasonable fear that respondents were not free to

continue working or to move about the factory." *Id.* at 220-21.

In this case, A.K.'s freedom of movement was restrained by a factor independent of

Byerson's presence in the home, or the actions taken therein:  she was a minor child who could

not walk away from her home. *See Florida v. Bostick*, 501 U.S. 429, 435-36 (1991) (finding the

"free to leave" inquiry not applicable because a bus passenger's freedom of movement was

curtailed by a factor independent of police conduct.)  Therefore, the Court must look to other

factors within the encounter to determine whether Byerson's conduct amounted to a seizure of

A.K.  *See Bostick*, 501 U.S. at 436.

The facts developed during discovery establish that Byerson approached A.K. in her own

home after Banin gave him consent to be present in the home.  Byerson asked A.K. a handful of

questions related to her contacts with Alipui, who was the subject of a police investigation, and

then left the apartment.  The only allegations that A.K. makes regarding Byerson's appearance or

demeanor during their contact is that while Byerson spoke to her, he had his hand on his uniform

belt, and his voice was serious and deep.  A.K. answered all of the questions that Byerson posed

to her, and never communicated to Byerson that she did not wish to speak with him.  Although

Byerson did not request Banin's permission to speak with A.K. prior to the conversation, A.K.

can point to no controlling legal authority requiring him to do so.

**B.      If Byerson's contact with A.K. constituted a seizure, that seizure was justified
by reasonable articulable suspicion.**

Although the evidence produced in discovery does not establish that Byerson's contact

with A.K. constituted a seizure, if the Court determines that Byerson seized A.K. when he spoke

to her, his actions do not violate the Fourth Amendment because any seizure that may have

resulted from Byerson's conversation with A.K. amounted to a permissible investigatory

detention. *See Terry v. OH*, 392 U.S. 1 (1968).  An officer who, during the course of his duties,

develops reasonable articulable suspicion that criminal activity is afoot, may briefly detain an

individual and pose to the individual a series of questions designed to quickly confirm or dispel

that suspicion. *Id.*  "[A]n investigatory detention must be temporary and last no longer than is

necessary to effectuate the purpose of the stop." *Lytes v. Smith*, 2014 WL 1314228, *10 (D.S.C. 2014), *citing Florida v. Royer*, 460 U.S. 491, 500 (1983).

A reasonable investigatory detention must be limited in both scope and duration. *U.S. v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011). In assessing whether a *Terry* detention is too long in duration to be justified as an investigative stop, Courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain" the individual. *Miller v. Commonwealth*, 16 Va. App. 977 (1993); *Burgess v. Commonwealth*, 14 Va. App. 1018 (1992); *U.S. v. Sharpe*, 470 U.S. 675 (1985). "With regard to the scope component, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Digiovanni*, 650 F.3d at 507, *quoting Florida v. Royer*, 460 U.S. 491, 500 (1983). If any unnecessary delay associated with an investigatory seizure can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation. *Digiovanni*, 650 F.3d at 509.

Police officers who seize and question juveniles during the course of their duties are under no obligation to inform the juvenile's parent of their seizure of questioning. The Fourth Circuit had occasion to consider the validity of such a seizure in the case of *Wofford v. Evans*, 390 F.3d 318 (4th Cir. 2004). *Wofford* involved a ten-year-old child who was suspected of bringing a gun to school in violation of state law and school rules. *Id.* at 321. School officials questioned the child on two separate school days, and on the second such day contacted the police for assistance. *Id.* at 321-22. Three detectives responded and questioned the child for ninety minutes regarding the alleged crime. *Id.* The child repeatedly asked for her mother to be

contacted and to go to the bathroom, however her mother was never called and she was

prohibited from using the bathroom.[9] *Id.*  In upholding the District Court's grant of summary judgment to the defendant detectives, the Fourth Circuit held that the seizure and questioning of the ten-year-old by the three detectives for ninety minutes without notifying her mother that she was being questioned was reasonable under the Fourth Amendment.  *Id.* at 327-28.

Byerson encountered A.K. in her bedroom, where she had gone to play on her electronic tablet after the police arrived at her home.  Byerson, who was investigating a man who was suspected of exporting electronic equipment, saw A.K. playing with the tablet and asked her a short series of questions designed to confirm or dispel his suspicion that the tablet could be evidence of Alipui's criminal activity.  This brief interaction, even if characterized as a seizure of A.K., was reasonable at its inception, and continued to be reasonable in both scope and duration until Byerson quickly determined that he would take no further police action related to the tablet. Byerson was under no obligation to obtain Banin's permission to speak with A.K.  Indeed, according to A.K., at all times while she and Byerson conversed, Banin was sitting in a position within the living room which afforded her the opportunity to see the hallway that led to A.K.'s room.  Further, after A.K. finished speaking to Byerson, Banin herself called A.K. into the living room to be put to further questioning in front of the officers.  Thus, based upon the totality of the circumstances, Byerson's seizure of A.K., to the extent that it occurred, was reasonable and in conformity with the Fourth Amendment.

---

[9] Similar to this case, the plaintiff in the *Wofford* case made allegations during discovery that were refuted by the defendant detectives; but for purposes of summary judgment the plaintiff's allegations were assumed to be true.  All parties agreed, however, that the child's parent was never notified that the police were questioning the child regarding a criminal allegation.

### III.   BYERSON IS ENTITLED TO QUALIFIED IMMUNITY.

Because A.K.'s evidence does not establish that Byerson unconstitutionally seized A.K. when speaking to her in her apartment, this Court need not go any further, and A.K.'s claim should be dismissed.  However, if this Court disagrees, then qualified immunity shields Byerson from liability.

Government officials engaged in the exercise of discretionary functions, being sued in their individual capacities, are entitled to the defense of qualified immunity.  *Butz v. Economou*, 438 U.S. 478 (1978).  In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the U.S. Supreme Court held that government officials are immune from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the conduct.  "Officials have qualified immunity either if the facts do not make out a violation of a constitutional right or if the right was not clearly established at the time."  *Snider v. Seung Lee*, 584 F.3d 193, 198 (4th Cir. 2009) (citing *Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 818-19 (2009)).  "In other words, courts ask 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Gandy v. Robey*, 520 Fed. App'x 134, 140 (4th Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

At the time of the officer's actions, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Beasley v.*

*Brown*, No. 3:12-CV-00006-JAG, 2013 WL 1288030 (E.D. Va. Mar. 27, 2013) (quoting *Wilson*

*v. Layne,* 526 U.S. 609 (1999)), *aff'd,* 539 Fed. App'x 288 (4th Cir. 2013).  Qualified immunity

gives government officials breathing room to make reasonable but mistaken judgments about

open legal questions.  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).  When properly applied,

it protects all but the plainly incompetent or those who knowingly violate the law.  *Id.*

There is no caselaw that prohibits an officer from briefly speaking with a juvenile in her

own home, without the explicit consent of her parent; particularly, under circumstances in which

the officer's presence in the home is pursuant to the consent of the juvenile's parent.  To the

contrary, analogous controlling authority within the Fourth Circuit, and from other circuits

permits this type seizure as reasonable.  *See e.g., Wofford v. Evans*, 390 F.3d 318 (4th Cir. 2004)

(police detective did not violate the Fourth Amendment rights of a ten-year-old child by

questioning the child in school administrative offices for 90 minutes without notifying her

mother, which was repeatedly requested by the child);  *Doe v. Bagan*, 41 F.3d 571, 575 (10th Cir.

1994) (Ten minute seizure of a nine-year-old child by a social services caseworker who

suspected the child of committing a sexual assault, without notifying the child's parent, was

insufficient to trigger constitutional liberty concerns).  *Compare Jones v. Hunt*, 410 F.3d 1221

(10th Cir. 2005) (sheriff's deputy and social worker unreasonably seized a child by questioning

her for over an hour and threatening to arrest her if she did not agree to live with her father, who

was under a restraining order to have no contact with the child due to prior abuse).  As such, even

if this Court were to find that Byerson's conduct constituted a violation of A.K.'s Fourth

Amendment rights, which it did not, such violation was not clearly established at the time that it

occurred, and a reasonable officer would not have understood that contact with a child such as

A.K. under these circumstances was a violation of the Fourth Amendment.

## CONCLUSION

In consideration of the foregoing, Byerson requests that this Court grant him summary

judgment on all claims asserts in the Complaint and dismiss the Complaint with prejudice.

Respectfully submitted,

BRIAN BYERSON
By Counsel

DAVID P. BOBZIEN
COUNTY ATTORNEY

By _____/s/_____
   Kimberly P. Baucom, Assistant County Attorney
   Virginia Bar Number 44419
   Attorney for Brian Byerson
   Office of the County Attorney
   12000 Government Center Parkway, Suite 549
   Fairfax, VA  22035-0064
   Phone: 703-324-2421
   Fax: 703-324-2665
   Kimberly.Baucom@fairfaxcounty.gov

## **CERTIFICATE OF SERVICE**

On October 3, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sent the foregoing to:

Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, Virginia 22314
vmg@robinhoodesq.com


_____/s/_____
Kimberly P. Baucom, Assistant County Attorney
Virginia Bar Number 44419
Attorney for Brian Byerson
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, VA  22035-0064
Phone: 703-324-2421
Fax: 703-324-2665
Kimberly.Baucom@fairfaxcounty.gov
